**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-1145

GATES CORPORATION,

    Plaintiff,

v.

CRP INDUSTRIES, INC.,

    Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Gates Corporation ("Gates") hereby brings this Complaint against Defendant CRP Industries, Inc. ("CRP") for violations of, *inter alia*, the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101 *et seq.*

**INTRODUCTION**

1. This action arises out of CRP's theft and unlawful use of Gates' trade secrets pertaining to its aftermarket automotive product data base. A former employee of Gates who later became employed by CRP, Gates' direct competitor, unlawfully entered Gates' password-protected servers and downloaded trade secret information on numerous occasions after her employment with Gates. While Gates initially learned only a portion of its former employee's unlawful entry into its database in February 2012, it did not become aware of the full magnitude of the unlawful entry and the involvement of CRP's management until the spring of 2016 when the former employee of Gates pled guilty to violation of criminal statutes 18 U.S.C. §§1030(a)(2)(C) and 1030(c)(2)(B)(i) and (iii).

2. From the factual statement entered in connection with the plea agreement, Gates became aware that at least two CRP director employees had knowledge of Gates' former employee's

1

unlawful access and downloading. According to this factual statement, this former employee transmitted Gates' trade secrets to these CRP director employees, who either had asked for the files or acknowledged their receipt. These CRP director employees were agents of CRP and acted within the scope of their employment in connection with the acts set forth in this Complaint and, on information and belief, other similar acts.

3. On information and belief, CRP used Gates' trade secrets to supplement its product coverage and create product lines that filled in gaps in Gates' aftermarket automotive product line. CRP's unauthorized and unlawful use of Gates' trade secrets has caused serious financial damage to Gates and weakened Gates' competitive advantage. Absent judicial intervention, Gates will suffer more harm.

4. CRP is liable for the misappropriation of Gates' trade secrets under the doctrine of *respondeat superior* because it's director employees, who were at all relevant times hereto acting on behalf of CRP and within the scope of their employment, authorized and encouraged the theft of Gates' trade secrets. Additionally, CRP ratified the torts of its director employees by accepting, using, and failing to turn over Gates' information that CRP knew or reasonably should have known constituted trade secrets that CRP's high-level employee-agents could not have obtained but for unauthorized misappropriation.

5. Gates is informed and believes, and herein alleges, that at all relevant times hereto the former employee of Gates acted on behalf of and within the scope of her employment with CRP. On information and belief, whenever the former employee of Gates accessed or downloaded Gates' trade secrets, she did so with authority or encouragement from CRP or its management, including at least David Hirschhorn and Robert Crane. On information on and belief, whenever the former

employee of Gates downloaded Gates' trade secrets, she gave that information to CRP through its director employees (including at least Messrs. Hirschhorn and Crane) in their capacities as agents of CRP. On information and belief, whenever the former employee of Gates gave Gates' trade secrets to CRP, she informed or alluded to the fact that the information was obtained through improper means.

## JURISDICTION AND VENUE

6. The Court has subject-matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332, as the parties have complete diversity of citizenship and the amount in controversy far exceeds $75,000 and 28 U.S.C. § 1331.

7. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b)(2), as the events described in this Complaint occurred in the District of Colorado.

## PARTIES

8. Gates is a Delaware corporation with its principal place of business at 1551 Wewatta Street, Denver, Colorado 80202. Gates is the world's leading manufacturer of power transmission belts and a premier global manufacturer of fluid power products. Gates' products are used in diverse industrial and automotive applications. Gates' products are sold globally. Gates has over 14,000 employees in its 106 locations in 30 countries. Gates' product lines are formatted through the use of innovative proprietary software as well as a cutting-edge and highly researched database. As of February 2012, Gates' catalog earned Gates 17 different awards from the National Catalog Managers Association. It now has received 29 awards.

9. Defendant CRP Industries, Inc. ("CRP") is a New Jersey corporation with its principal place of business at 35 Commerce Dr., Cranbury, New Jersey 08512. CRP also has a

corporate office in Mexico.  CRP distributes and sells automotive and other industrial products in at least the United States, Canada, and Mexico.  CRP is a direct competitor of Gates.

## FACTUAL ALLEGATIONS

**GATES' TRADE SECRETS**

10. Gates has created a highly valuable database (the "Gates Database") of confidential business information including, *inter alia*, Gates' entire automotive-product line.  The Gates Database is stored electronically in the form of an APA.mdb file.  This password-protected APA.mdb file is stored as a compressed APA.zip file, which itself was stored on Gates' password-protected FTP server.  In other words, the Gates Database is subject to multiple layers of electronic protection and is not accessible to anyone without those passwords.

11. Gates takes substantial measures to guard closely the Gates Database.  Only select employees are given access to the Gates Database.  Gates uses password protection to protect the Gates Database from unauthorized access, and does not permit anonymous access.  Gates obligates employees to sign confidentiality agreements.  Select customers may be given access to the Gates Database, but that access is carefully limited to only certain classes of information under confidentiality restrictions.

12. The information contained in the Gates Database has tremendous financial value to Gates, which considers the Gates Database to be a differentiator in the automotive-parts industry.  By 2012, the highly specialized Gates Database included 123 tables, 209 queries, 4 forms, 9 macros, and 4 modules with 6 subroutines.  The 80 primary tables contained 6,539,123 records.  The Gates Database also includes Vehicles in Operation ("VIO") data that Gates purchases.  VIO data is non-

public, proprietary data that companies in the automotive-parts industry purchase. Gates pays an annual premium for updated VIO data, and keeps that data confidential.

13. Gates updates the Gates Database frequently (often multiple times per month). Gates pays researchers a combined salary of over $50,000 per month to update the Gates Database by observing and inputting real-time changes in the marketplace. Thus, the Gates Database contains information about products that Gates will offer (and extensive and valuable market research) before the information is made public. In other words, the information in the Gates Database is the backbone of Gates' sales. In the hands of a competitor, the Gates Database could cause substantial financial harm to Gates and eliminate its competitive advantage.

14. Gates also developed proprietary software to view the information in the Gates Database stored on the APA.mdb files. This software, Partsource.exe, was painstakingly developed over a five-year period. Gates publishes some of the data on its APA.mdb files and servers for public viewing, but much of the information—including the VIO data that Gates paid for and continues to pay for—is closely guarded.

**MISAPPROPRIATION OF GATES' TRADE SECRETS**

15. Laura Bale (formerly, Laura Chitwood), the Gates' former employee, was an employee of Gates for 25 years. While a Gates employee, her supervisor was David Haun. While employed by Gates, the former employee developed certain software for Gates and was involved with storage of the automotive parts list in the Gates Database. This former employee was assigned a personal username and password to access Gates' password-protected server, and knew that the separate password that could be used to access the APA.zip file where the Gates Database was stored.

16. On or about August 25, 2009, Gates terminated the aforementioned employee. Upon her termination, she signed an "Employee Termination Statement" wherein she agreed to turn over all confidential and trade-secret information to Gates and agreed that confidential and trade-secret information was not to be shared with anyone outside of Gates. Her account username and password to access Gates' password-protected FTP server were deactivated.

17. Following her termination, Gates' former employee became employed by CRP, in or around early February 2010. On information and belief, while she was employed by CRP, which has its principal place of business in New Jersey, she worked for CRP exclusively from her home in Colorado. Following her hire by CRP, Gates sent her a letter on February 15, 2010 emphasizing her responsibility to maintain the confidentiality of Gates' confidential and trade-secret information. Gates copied CRP on this letter.

18. Gates became aware of the unlawful accessing and attempts to access Gates' server on February 8, 2012, when Mr. Haun received an email from Gates' former employee containing VIO data. The subject line of the email was "Present," the text read "Check this out...," and there was an Excel spreadsheet attached to the email entitled "VIO.xlsx."

19. Mr. Haun suspected that the email was sent to him in error, because the aforementioned employee was no longer employed by Gates and had no legal access to Gates' servers, and because the message appeared to be intended for David Hirschhorn, the Director of Brand Management at CRP and supervisor of Gates' former employee.

20. When Mr. Haun opened the Excel spreadsheet, he recognized the data as being the same as the data in the Gates Database. Mr. Haun compared the APA.mdb file with the VIO.xlsx file and found them to be the same. Suspecting that Gates' former employee had accessed Gates'

4817-7837-6496.2

password-protected FTP servers, Mr. Haun reviewed the server logs and discovered that the same IP address in the header of the email entitled "Present" had been used on several occasions previously to access the Gates server.

**FBI INVESTIGATION AND SEARCH OF GATES' FORMER EMPLOYEE'S RESIDENCE AND COMPUTER HARDWARE**

21. After Haun discovered this unlawful breach of the Gates' server and Gates Database, Gates notified the FBI. According to the plea agreement, the FBI investigation revealed the following information.

22. Through an IP-address analysis, it was determined that some of the IP addresses used to access the Gates' servers were assigned to Gates' former employee's home in Colorado from the period beginning March 28, 2011 forward. Gates had not preserved FTP server logs older than March 28, 2011.

23. At least between March 28, 2011 and February 28, 2012, and during her employment with CRP, Gates' former employee accessed Gates' password-protected FTP server at least 36 times without authorization. To gain access to Gates' password-protected servers, she used login credentials that had not been assigned to her. She accessed the servers with the username "lorci," which had been assigned to a former Gates' trading partner. In July 2011, Gates deactivated the "lorci" username, and subsequently Gates' former employee switched to the username "GATES," which had been assigned to specific Gates' customers. Finally, she accessed the servers using the username "Market1," which had a much more limited access to content.

24. Gates' former employee unsuccessfully attempted to access the servers at least 162 additional times during the period of March 28, 2011 to February 28, 2012 with expired or invalid credentials. After the "lorci" account had been disabled in July 2011, she attempted (unsuccessfully)

7

to use it at least 13 more times. She also attempted (again unsuccessfully) to use anonymous login credentials 146 times, none of which were successful. The remaining three failed attempts were with the "GATES" login credential.

25.     During the period of March 28, 2011 to February 28, 2012, Gates' former employee accessed Gates' password-protected FTP server and unlawfully downloaded Gates' intellectual property on at least 23 different occasions. She downloaded Partsource.exe software and the APA.mdb files containing the Gates Database from the server.

26.     On June 12, 2012, the FBI executed a valid search warrant at the residence of Gates' former employee, during which she agreed to a voluntary, non-custodial interview. During the interview, she stated that she periodically reviewed the Gates Database during her employment with CRP to determine if the Gates Database was updated and that the email she sent to Haun was meant for Hirschhorn. She also acknowledged that the Gates Database was confidential.

27.     During the interview on June 12, 2012, Gates' former employee also gave a written statement that "I was laid off August of 2009 from Gates. I do not have any bad feelings towards Gates. I did not maliciously take data from Gates to harm them. I did not give the database to anyone." Despite her representations, the FBI discovered that she had indeed given Gates' trade secrets to Messrs. Crane and Hirschhorn, two directors of CRP.

28.     Mr. Crane was a high-level CPR employee, and during the relevant time period, was the Director of Sales and Marketing, Traditional Aftermarket at CRP. On information and belief, in this capacity, Mr. Crane supervised sales and marketing, and thus would have been directly responsible for programs that used and benefitted from Gates' misappropriated trade secrets. Mr. Crane was, at all times relevant hereto, acting on behalf of CRP and within the scope of his

employment. CRP is liable for the acts or omissions of Mr. Crane because CRP placed him in a management position that enabled him to participate in the theft upon Gates, and because Mr. Crane did in fact authorize and encourage the misappropriation of Gates' trade secrets. On information and belief, when Mr. Crane was given Gates' misappropriated trade secrets, he used them and gave them to other CRP employees, directors, and officers, who knew or reasonably should have known that the information was obtained through improper means.

29. Mr. Hirschhorn is also a high-level CRP employee and, during the relevant time period, was the Director of Brand Management at CRP. On information and belief, Mr. Hirschhorn is directly responsible for the development of the Rein Automotive program, the program which Gates alleges incorporated Gates' misappropriated trade secrets. Mr. Hirschhorn was, at all times relevant hereto, acting on behalf of CRP and within the scope of his employment. CRP is liable for the acts of Mr. Hirschhorn because CRP placed him in a management position that enabled him to participate in the theft upon Gates, and because Mr. Hirschhorn did in fact authorize and encourage the misappropriation of Gates' trade secrets. On information and belief, when Mr. Hirschhorn was given Gates' misappropriated trade secrets, he used them and gave them to other CRP employees, directors, and officers, who knew or reasonably should have known that the information was obtained through improper means.

30. The FBI searched the residence of Gates' former employee on June 12, 2012, and found the following: (1) a Dell computer with five copies of the APA.mdb files, at least one of which was created after her termination from Gates; (2) a Seagate external hard drive with four copies of the APA.mdb files; and (3) a Western Digital external hard drive that contained a file with

the web address for Gates' password-protected FTP server, the username "lorci," and the password to access that username.

31. The Western Digital external hard drive also contained software: (1) copies of Partsource.exe; and (2) two copies of PartSourceSetup.zip and two copies of APA.rsc, both with modified dates of November 29, 2011 and both of which were uploaded onto Gates' FTP server on November 29, 2011—well after termination of Gates' former employee's and well into her employment with CRP.

32. The Western Digital external hard drive also contained electronic communications between Gates' former employee and Mr. Crane. In a March 30, 2011 email with the subject line "Gates," Mr. Crane asked Gates' former employee: "Could you get your hands on an AC Delco to Gates interchange for me? Working on a huge project and cannot seem to find one. I need Serpentine and timing crosses." Mr. Hirschhorn was copied on this email. In response to the March 30, 2011 email, Gates' former employee provided an Excel spreadsheet entitled Gates_to_ACDelco.xls, which contained (1) Gates part numbers; (2) AC Delco part numbers; and (3) part types. In the body of her email, Gates' Former Employee wrote "you didn't get it from me! ;)"

33. The Western Digital external hard drive also contained a query of the APA.mdb files, named qryUtility-InterchangeGatesACD, the results of which are substantially similar to the Gates_to_ACDelco.xls Excel spreadsheet that Gates' former employee sent to Mr. Crane on March 30, 2011.

34. The Western Digital external hard drive also contained electronic communications between Gates' former employee and Mr. Hirschhorn. The communication was to Mr. Hirschhorn's

CRP email address (DHirschhorn@CRPindustries.com) on September 23, 2011, and used the subject line "Present for you." This email contained an attachment entitled VTwVIO.xls. Mr. Haun reviewed this file and concluded that the data located therein was created from the APA.mdb files.

35. The Dell computer of Gates' former employee contained Yahoo Instant Message ("IM") chats between Gates' former employee and Mr. Hirschhorn on September 23, 2011 that immediately followed the "Present for you" email and discussed that email. Gates' former employee stated "i don't know how accurate that is….and you know where its [*sic*] from . . . but that is your vio that is no more than a year old . . . did you see the 'goodie' I sent you." Gates' former employee further stated "the engines are NOT formated [*sic*] the way we do it . . . I'm going to take it and try and use it into my database."

36. In response to Gates' former employee's IM, Mr. Hirschhorn stated, "I'd be afraid to get reports based on a VIO list that we're not supposed to have." Gates' former employee replied, "up to you," to which Mr. Hirschhorn replied "do you think these numbers are much different than ours?"

**COMMUNICATION BETWEEN GATES AND CRP'S COUNSEL**

37. Gates outside counsel sent a letter to Dan Schildge, President of CRP on March 16, 2012. Counsel informed Mr. Schildge of the email that Mr. Haun received from Gates' former employee, and asked whether CRP possessed any software or any information from the Gates Database that the Gates' former employee had downloaded.

38. On April 29, 2012, Gates' outside counsel received a response letter from counsel for CRP, who assured him that CRP was investigating the matter. Counsel for CRP followed up on June 6, 2012 and informed Gates' counsel that: (1) "CRP has completed its investigation and

11

confirmed that no one affiliated with CRP downloaded and/or made use of the Gates confidential information referenced in your March 16 letter" (2) "CRP has also confirmed that the confidential information referenced in your March 16 letter does not reside on its servers and/or computer systems, and that CRP does not have any record of this information in either electronic or hardcopy form" and (3) Gates' former employee "has represented to CRP that she did not use or disclose any of the Gates confidential information referenced in your March 16 letter. [Gates' former employee] is no longer employed by CRP."

39. Subsequent to the June 6, 2012 letter, CRP released a new product line of hoses, the Rein-branded hose product line. The Rein-branded hose product line filled gaps in the Gates product line, meaning that the Rein-branded hose product line was composed mostly of products that Gates' product line did not offer. Gates became suspicious that the products in CRP's new line were cherry picked from unlawful access to Gates' trade secrets, given that it would have taken a substantial amount of time and money to create such a product line without access to Gates' trade secrets.

40. On January 10, 2013, Gates' counsel wrote back to counsel for CRP and informed counsel for CRP of Gates' suspicions, requesting that CRP undertake another, more thorough investigation.

41. On January 24, 2013, counsel for CRP responded and assured Gates that "CRP has confirmed that the cataloging data for the parts compiled in connection with its Rein-branded hose program was derived from OE electronic parts catalogs made available by various car manufacturers. None of the Gates' confidential information referenced in your letters of March 16, 2012, and January 10, 2013, was used in the development of CRP's Rein-branded hose program or any other product line."

12

42. During this period, the FBI and United States Attorney were conducting their non-public investigation of Gates' former employee. Neither Gates nor Gates' counsel was aware of the emails or other communications between Gates' former employee and any CRP directors that the FBI discovered during its execution of the search warrant on June 12, 2012 and subsequent examination of Gates' former employee's computer hardware.

43. In the spring of 2016, when the FBI and United States Attorney completed their investigation of Gates' former employee, Gates was provided with a draft statement of facts from the United States Attorneys Office. Only then did Gates learn the extent of CRP's involvement in the unlawful accessing and downloading of Gates' trade secrets.

## FIRST CLAIM FOR RELIEF
### TRADE-SECRET MISAPPROPRIATION—C.R.S. § 7-74-101 *ET SEQ.*

44. Gates incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

45. Gates undertook substantial efforts to maintain the secrecy of Gates' valuable software, portions of the Gates Database that were not made public, and any VIO data that Gates purchased. Accordingly, these were all Gates' trade secrets.

46. Gates' former employee, who voluntarily signed an Employee Termination Statement containing non-disclosure provisions, subsequently acquired Gates' trade secrets by improper means by, *inter alia*, using unauthorized login credentials to access Gates' password-protected FTP servers and password-protected files contained therein. She conceded to the FBI that she accessed the servers using improper means.

47. CRP acquired Gates' trade secrets on at least two occasions when Gates' former employee emailed CRP's directors, Messrs. Crane and Hirschhorn.

13

48.  Mr. Crane, a director of CRP, knew or had reason to know that the Gates_to_ACDelco.xls spreadsheet that he acquired from Gates' former employee on March 30, 2011 was acquired by improper means.

49.  Mr. Hirschhorn, a director of CRP, knew or had reason to know that the VTwVIO.xls file he acquired from Gates' former employee on September 23, 2011 was acquired by improper means.

50.  As Directors of CRP, Messrs. Crane and Hirschhorn's actions were imputed to CRP.

51.  As a proximate result of CRP's misappropriation of Gates' trade secrets, Gates has suffered, and will continue to suffer, irreparable harm, as well as damages in an amount to be proven at trial, but at least more than $75,000.

52.  Because Gates' remedy at law is inadequate, Gates seeks preliminary and permanent injunctive relief. Gates is threatened with losing customers, trade secrets, its competitive advantage, and good will in an amount that may not be possible to determine. Thus, CRP must be restrained from any further use of Gates' trade secrets, and must be compelled to return all of Gates' trade secrets to Gates.

53.  CRP's misappropriation has been willful and malicious in light of the fact that Messrs. Crane and Hirschhorn knew or had reason to know that Gates' former employee acquired the information improperly from Gates, a direct competitor of CRP, and still accepted those documents. Therefore, Gates is entitled to an award of exemplary damages pursuant to C.R.S. § 7-74-104(2) and attorneys' fees pursuant to C.R.S. § 7-74-105.

**SECOND CLAIM FOR RELIEF**
**UNFAIR MISAPPROPRIATION OF BUSINESS VALUES**

54. Gates incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

55. Gates and CRP are direct competitors in the automotive-parts industry.

56. Gates expended massive amounts of labor, skill, and money developing, testing, implementing, researching, and maintaining its cutting edge software and Gates Database, which has received 29 awards for its excellence. Gates paid a large sum for its VIO data and pays more money each year for updated VIO data. Gates employs many researchers to constantly update its automotive-parts product line based on the most sophisticated and current market research.

57. CRP unfairly appropriated Gates' expenditure of labor, skill, and money when its directors knowingly or with reason to know acquired and used Gates' trade secrets to develop CRP's Rein-branded hose product line.

58. As a proximate result of CRP's misappropriation of Gates' trade secrets, Gates has suffered, and will continue to suffer irreparable harm, as well as damages in an amount to be proven at trial, but at least more than $75,000.

59. Because Gates' remedy at law is inadequate, Gates seeks preliminary and permanent injunctive relief. Gates is threatened with losing customers, trade secrets, its competitive advantage, and good will in an amount that may not be possible to determine. Thus, CRP must be restrained from any further use of Gates' trade secrets, and must be compelled to return all of Gates' trade secrets to Gates.

### THIRD CLAIM FOR RELIEF
#### TORTIOUS INTERFERENCE WITH CONTRACT

60. Gates incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

61. Gates' former employee's Employee Termination Statement, which she and Gates signed and which contains non-disclosure provisions, constitutes a valid contract between Gates and her.

62. CRP knew or had reason to know of Gates' former employee's contract with Gates for at least the following reasons: (1) Gates and CRP are direct competitors in the automotive-parts industry; (2) Gates has received numerous awards for its proprietary software and the Gates Database; (3) Gates' former employee worked in the development of Gates software and the Gates Database; (4) CRP hired Gates' former employee within five months of her termination from Gates; and, (5) CRP was copied on the February 15, 2010 letter to the Gates' former employee outlining her confidentiality obligations to Gates. Given the circumstances, a reasonable employer in CRP's position would have inquired about her confidentiality obligations when or before it hired her.

63. CRP, through its directors, Messrs. Crane and Hirschhorn, intentionally induced Gates' former employee to breach the Employee Termination Statement by sending Messrs. Crane and Hirschhorn Gates' trade secrets. As evidenced by the statements and actions of Messrs. Crane and Hirschhorn described more fully herein, both had knowledge that they were obtaining Gates' trade secrets and knowledge and that Gates' former employee used improper means to obtain those trade secrets and knowledge.

64. As a proximate result of CRP's intentional interference with the Employee Termination Statement between Gates' former employee and Gates, Gates has suffered, and will continue to suffer damages in an amount to be proven at trial, but at least more than $75,000.

65. Because Gates' remedy at law is inadequate, Gates seeks preliminary and permanent injunctive relief. Gates is threatened with losing customers, trade secrets, its competitive advantage,

16

4817-7837-6496.2

and good will in an amount that may not be possible to determine. Thus, CRP must be restrained from any further use of Gates' trade secrets, and must be compelled to return all of Gates' trade secrets to Gates.

66. In intentionally interfering with the contract between Gates' former employee and Gates, CRP acted with willful and wanton disregard for the rights of Gates. Therefore, Gates is entitled to an award of exemplary damages pursuant to C.R.S. § 13-21-102.

### FOURTH CLAIM FOR RELIEF
### COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 ET SEQ.

67. Gates incorporates herein by reference all other paragraphs of this Complaint as if those allegations were set out explicitly herein.

68. Gates password-protected FTP server constitutes a protected computer in that the information contained therein is used in interstate and foreign commerce.

69. Gates' former employee did not have authorization to enter Gates' server, as she had been terminated and her credentials had been revoked. The unauthorized nature of her access is highlighted by the fact that she used unauthorized credentials belonging to others, attempted to (but failed to) log in 162 times, and admitted to the FBI that her entry was unauthorized.

70. Gates' former employee accessed Gates' servers on behalf of CRP for CRP's benefit, as evidenced by her communications with Messrs. Crane and Hirschhorn in which she used terms like "Present" to describe the transmission of Gates' trade secrets to CRP directors or where the CRP directors expressed to her that they knew they were not allowed to access the VIO data that she gave them.

17

71.     CRP therefore had knowledge and an intent to defraud Gates by secretly and unlawfully asking its employee, Gates' former employee, to send Gates' trade secrets to Mr. Crane and by reviewing Gates' trade secrets that she had sent to Mr. Hirschhorn.

71.     Gates has incurred substantial loss in responding to Gates' former employee's and CRP's unlawful access of Gates' trade secrets by employing counsel and investigating the incident, and in conducting a damage assessment to determine the extent of the harm to Gates' software or the Gates Database.

72.     As a proximate result of CRP's intentional misconduct, Gates has suffered, and will continue to suffer damages in an amount to be proven at trial, but at least more than $75,000.

73.     Because Gates' remedy at law is inadequate, Gates seeks preliminary and permanent injunctive relief.  Gates is threatened with losing customers, trade secrets, its competitive advantage, and good will in an amount that may not be possible to determine.  Thus, CRP must be restrained from any further use of Gates' trade secrets, and must be compelled to return all of Gates' trade secrets to Gates.

**PRAYER FOR RELIEF**

WHEREFORE, Gates respectfully requests the following relief:

A.     That the Court enter a preliminary and permanent injunction (1) prohibiting CRP from using any of Gates' trade-secret information; and (2) mandating that CRP turn over any and all information concerning or related to Gates' trade-secret information, including but not limited to emails between Gates' former employee and CRP directors, officer, or employees concerning or related to Gates' trade-secret information; emails among any and all other CRP directors, officers, or

employees concerning or related to Gates' trade-secret information; and any charts, Excel sheets, or any other data taken from Gates' servers, and any information derived therefrom;

B. Compensatory damages in an amount to be determined according to proof at trial but in an amount of at least more than $75,000;

C. Punitive damages;

D. Reasonable attorneys' fees and costs, pursuant to C.R.S. § 7-74-105 and any other applicable law;

E. Pre-judgment and post-judgment interest on any award of damages to the fullest extent permitted by law; and

F. Any additional legal or equitable relief that the Court deems just and proper.

## JURY DEMAND

Gates demands a jury trial on all issues triable to a jury.

DATED: May 17, 2016                    Respectfully submitted,


                                By:   s/ George G. Matava
                                      George G. Matava
                                      Donald E. Lake, III
                                      Samantha Picans
                                      LEWIS BRISBOIS BISGAARD & SMITH LLP
                                      1700 Lincoln Street, Suite 4000
                                      Denver, Colorado 80203
                                      (303) 861-7760
                                      Attorneys for Gates Corporation

Plaintiff's Address:
1551 Wewatta St.
Denver, CO 80202