IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-01145-KLM

GATES CORPORATION,

   Plaintiff,

v.

CRP INDUSTRIES, INC.,

   Defendant.

_____

**ORDER**
_____

This matter is before the Court on Defendant's **Objection to Report and Recommendation of Special Master on Gates Corporation's Motion to Pierce Attorney/Client Privilege** [#139][1] (the "Objection"). The Court has reviewed and considered the following pleadings in connection with ruling on the Objection: Plaintiff's Motion to Pierce the Attorney/Client Privilege [#88]; Defendant's Opposition to Motion to Pierce Attorney/Client Privilege [#91]; Plaintiff's Reply to CRP's Response to Motion to Pierce the Attorney/Client Privilege [#95];[2] Defendant's Surreply Memorandum of Law in Further Opposition to Plaintiff's Motion to Pierce Attorney/Client Privilege [#98-1]; Discovery Master's Preliminary Report and Recommendation on Plaintiff Gates Corporation's Motion

---

   [1] "[#139]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

   [2] An unredacted version of Plaintiff's Reply was filed at Docket No. 93.

to Pierce Attorney/Client Privilege [#134] (the "Discovery Master's Report"), the Objection [#139] and Plaintiff's Response to Defendant's Objection [#148], and is otherwise fully advised in the premises. For the reasons explained below, the Objection is **OVERRULED**.

**I. Procedural Background**

As discussed in detail in the Discovery Master's Report [#134], the dispute at issue involves Plaintiff's desire for compelled production of documents Defendant has identified as protected by the attorney-client privilege. Despite this protection, the crime-fraud exception vitiates the attorney-client privilege "where the client consults an attorney to further a crime or fraud." *In re Vargas,* 723 F.2d 1461, 1467 (10th Cir. 1983). The parties do not disagree about the procedural framework for determination of whether the crime-fraud exception applies, so I mention it only briefly here. The United States Supreme Court held in *United States v. Zolin,* 491 U.S. 554 (1989), that *in camera* review is permissible to adjudicate the applicability of the crime-fraud exception to the attorney-client privilege when there is a "showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.* at 572 (citation omitted). In his lengthy and thorough analysis, the Discovery Master concluded that *in camera* review of the disputed documents is appropriate because of a showing of "wrongful conduct [that] may well, upon a close reading, qualify as prima facie crime or fraud." *Discovery Master's Report* [#134] at 32 (internal quotation marks omitted).

Defendant objects to the Discovery Master's Report on two general bases: first, that the Discovery Master erroneously evaluated Defendant's actions in hindsight and not based

on what Defendant knew at the time of those actions; and second, that the Discovery Master erroneously ordered *in camera* review on grounds not raised by Plaintiff. *Objection* [#139] at 10-17. More specifically, Defendant asserts that the Report's conclusion that Defendant engaged in concealment by omitting material facts which it had a duty to disclose is unsupported. Defendant also contends that the law does not hold that a flawed or inadequate document preservation effort is grounds for piercing the privilege. *Id.* at 13-32. In response, Plaintiff asserts that Defendant "has failed to offer any meaningful explanation as to why *in camera* review should be precluded," thus suggesting that it "has something to hide." *Response to Objection* [#148] at 8-9. Further, Plaintiff asserts that Defendant's fraudulent intent can be inferred from evidence that a company official contemporaneously knew that an employee stole Plaintiff's proprietary information and that she was using it, yet the company denied those facts when responding to Plaintiff's inquiry about the theft. *Id.* at 15-18.

## II. Analysis

**A.     The Evidence Asserted by Plaintiff of Defendant's Wrongful Conduct**

At its core, this dispute centers around whether Defendant's actions in response to Plaintiff's inquiry about its former employee's theft of proprietary information can serve as the basis for invocation of the crime-fraud exception to the attorney-client privilege.[3] Defendant, a corporation alleged to be "a direct competitor of" Plaintiff, describes its

---

[3] The Discovery Master recommended that *in camera* review of the disputed documents occur as a first step in the process of deciding whether invocation of the crime-fraud exception is appropriate. Nothing in this Order is intended to express any opinion as to whether the crime-fraud exception applies to the disputed documents, which have not yet been tendered to the Discovery Master for review.

conduct as reasonable under the circumstances considering what it knew when confronted by Plaintiff with concerns about the theft. *Second Am. Compl.* [#84] ¶ 10; *Objection* [#139] at 10-13. Defendant appears to suggest that its course of action in response to Plaintiff's inquiry may have been conservative or less than perfect, but that there is no basis for a reasonable person to conclude that a crime or fraud was underway. However, the evidence presented by Plaintiff sufficiently suggests otherwise.

A brief recitation of only a portion of that evidence suffices to make the point. Defendant admits that after Plaintiff's counsel notified Defendant of the potential theft of proprietary information by Plaintiff's former and Defendant's then-current employee, Laura Bale ("Bale"), the company eventually commenced an "investigation." Bale's supervisor throughout her employment with Defendant was David Hirschhorn ("Hirschhorn"), Defendant's Director of Brand Management. *Scheduling Order* [#23] at 4. At an early point in Defendant's investigation, a non-lawyer human resources executive performed a keyword search of Hirschhorn's emails but "did not find any evidence that [Hirschhorn] had received any proprietary information from Bale." *Objection* [#139] at 4 (citing *Depo. of Rahael Sobon* [#88-7] at 30:19-32:15; *Depo. of Sabine Gilson* [#88-6] at 43:8-22, 60:21-61:9).[4]

Despite Defendant's contemporaneous conclusion that Hirschhorn did not "receive" any of Plaintiff's proprietary information from Bale, it is now undisputed that this conclusion

---

[4] The deposition testimony to which Defendant refers does not explicitly state that Defendant did not find any evidence that Hirschhorn had received proprietary information from Bale. It simply confirms the company's human resources employee's "quick search . . . from David [Hirschhorn's] email" and the fact that she focused on Ms. Bale and discussed the investigation around the theft with Hirschhorn. Nevertheless, for purposes of the instant issue, the Court gives Defendant the benefit of the doubt.

was incorrect. Defendant has acknowledged that Hirschhorn subsequently admitted to the FBI that he received and opened the file containing Plaintiff's confidential information, and Defendant has made no argument that Hirschhorn lied to the FBI. *Objection* [#139] at 5; *Plea Agreement* [#88-15] at 18. More importantly, at the time of its "investigation," Defendant appears to have stopped short of attempting to determine the extent to which the information stolen by Bale was actually being used for the company's benefit. For example, Bale (whose credibility is of course blemished) subsequently testified under oath that Hirschhorn knew about her possession of Plaintiff's proprietary database approximately six months after she started working for Defendant, long before the "investigation" began. *Depo. of Laura Bale* (the "Bale Depo.") [#95-2] at 246:22-247:6. Moreover, despite Bale's compromised credibility, her testimony in this regard has been amply confirmed by other evidence. As mentioned above, Hirschhorn himself later admitted to the FBI that Bale sent him Plaintiff's proprietary information and that he discussed her access to Plaintiff's and Defendant's systems and use of Plaintiff's data. *Response to Objection* [#148] at 16-18; *Plea Agreement* [#88-15] at 18. Instant messages between Bale and Hirschhorn during their employment confirm that months before Plaintiff's first inquiry to Defendant about the theft, Bale essentially told Hirschhorn that she was obtaining proprietary information from Plaintiff. One message further confirms that Hirschhorn understood that Bale's actions were wrong, but he nevertheless encouraged them. *Reply* [#95] at 5-6; *Plea Agreement* [#88-15] at 18; *Bale Depo.* [#95-2] at 268:9-11. Bale unequivocally testified in her deposition that Hirschhorn knew she had access to Plaintiff's database as of September of 2011, and that he used information she provided to him from the database. *Bale Depo.* [#95-2] at 256:2-5, 271:6-13, 277:13-24, 296:21-297:3, 298:3-8.

Defendant contends that because Plaintiff's counsel's letter about the alleged theft "implicated Bale alone, [Defendant] reasonably focused its investigation on Bale, who worked off of her own laptop and used a personal email address, instead of launching a company-wide investigation." *Objection* [#139] at 21. Based on the information currently provided to the Court, I cannot agree that so limiting the investigation was reasonable or prudent.

First, although Bale worked from her home in Colorado and the Defendant's main office is in New Jersey, she was not a solitary or isolated employee. The evidence demonstrates that her work contemplated and required frequent interactions with other company employees. Bale stipulated in her Plea Agreement that during her 25-year employment with Plaintiff prior to working for Defendant, her job had been to develop part of the information she later took from Gates. *Plea Agreement* [#88-15] at 10. According to the Second Amended Complaint, Hirschhorn admitted to the FBI that Bale was hired by Defendant to integrate data used by Plaintiff into Defendant's database and to make this information accessible and easy to use. *Second Am. Compl.* [#84] ¶ 54. In addition, Bale had regular email contact with supervisors in the company, including Hirschhorn. *Id.* ¶¶ 40-48; *Answer* [#86] at 6-7; *Bale Depo.* [#95-2] at 212:19-213:10, 247:11-249:22. She also communicated "almost daily" by Instant Message with Hirschhorn. *Reply* [#95] at 5; *Bale Depo.* [#95-2] at 293:2-10. To suggest that Defendant was somehow unaware of the extent of Bale's company interactions is not credible.

Moreover, Defendant's protest that Hirschhorn did not admit any knowledge of wrongdoing at the time of the investigation and that the company only learned several years later that he received and opened the file containing Plaintiff's confidential information

is unavailing. *Objection* [#139] at 5. Defendant seems to suggest that for purposes of the crime-fraud exception, its conduct must be evaluated in terms of *what only certain chosen corporate officials knew at the time of the alleged wrongdoing, not what other corporate employees knew*. Defendant fails to account for the evidence of Bale's and Hirschhorn's knowledge of the wrongful use of confidential information and their undisputed failure to disclose it, as if their status as corporate employees and agents is meaningless. This argument cannot be correct.

First, if Defendant were correct, corporate parties to litigation could avoid scrutiny of their attorney-client communications by simply contending that although some employees did bad things, the wrongdoers neither admitted it to select company representatives nor did those representatives otherwise find out about it, so the crime-fraud exception does not apply. The core of this assertion appears to be that although there was fraud, as long as it was committed by only a few employees without evidence of other corporate actors' involvement, the crime-fraud exception does not apply. Defendant cites no authority for this contention. As far as the Court is aware, the law does not countenance such a facile escape hatch.

Second, Defendant's argument flies in the face of long-standing precedent holding that corporate agents' acts are attributable to the corporate entity. *See, e.g., In re Stat-Tech Sec. Litig.,* 905 F. Supp. 1416, 1422 (D. Colo. 1995) (holding "the acts and knowledge of an agent are imputed to the principal" and "[b]ecause a corporation can only act through its agents, the rule is that the actions of corporate officers and directors are attributable to the corporate entity"). Indeed, a corporation may be held liable for fraud because it places "an agent in a position to commit the wrongdoing and then fails to exercise an adequate

amount of supervision."  *King v. Horizon Corp.,* 701 F.2d 1313, 1318 (10th Cir. 1983).  Even a lower-level corporate employee can bind a company by her fraudulent actions in some circumstances.  *See, e.g., Cenco, Inc. v. Seidman & Seidman,*  686 F.2d 449, 456 (7th Cir. 1982).

In short, the law generally recognizes no distinction between Bale and Hirschhorn, employees of Defendant, and Defendant for purposes of liability for fraud, so long as the employees' actions were taken on behalf of the company, as they indisputably were here.  Bale's and Hirshchorn's knowledge and concealment at the time of the inquiry by Plaintiff *are the company's knowledge and concealment at that time*.  *See, e.g., Adams v. Kinder-Morgan, Inc.,* 340 F.3d 1083, 1106-07 (10th Cir. 2003) (holding that in the context of fraud, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability").  The allegations of concealment made by Plaintiff involve the type of misconduct frequently invoked to support application of the crime-fraud exception to the attorney-client privilege.  *See, e.g., Plaza Ins. Co. v. Lester*, No. 14-cv-01162-LTB-CBS, 2015 WL 3528336, at *16 (D. Colo. June 4, 2015) (finding fraudulent concealment and nondisclosure vitiates attorney-client privilege pursuant to the crime-fraud exception); *Ryskamp ex rel. Boulder Growth & Income Fund v. Looney*, No. 10-cv-00842-WJM-KLM, 2011 WL 3861437, at *8-10 (D. Colo. Sept. 1, 2011) (finding crime-fraud exception properly invoked where plaintiff alleged that defendant had manipulated the date of a rights offering); *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 290 (E.D. Va. 2004) ("[T]he crime/fraud exception extends to materials or communications created in planning, or in furtherance of, spoliation of evidence.").  Accordingly, the Court cannot conclude that the Discovery Master's Report inappropriately

evaluated Defendant's conduct in light of hindsight instead of what it knew at the time.

Defendant further argues that the Discovery Master erroneously recognized mere spoliation as a "crime" or "fraud" which triggers the exception. *Objection* [#139] at 28-32. "[E]ven if [Defendant's] 'investigation' or 'preservation effort' did fall short in some respect, . . . that would provide no basis for piercing the privilege or even ordering *in camera* inspection." *Id.* at 28. Defendant contends that "[r]elying on a breach of a duty to preserve is fundamentally inconsistent with the requirement that the crime-fraud exception requires intent." *Id.* at 30.

But spoliation can occur as a result of mere negligence or intentional destruction of evidence, so to the extent that the Discovery Master concluded that *intentional* spoliation supports application of the crime-fraud exception, his conclusion is not inconsistent with the intent requirement of the doctrine. *See e.g., McCargo v. Texas Roadhouse, Inc.*, No. 09-cv-02889-WYD-KMT, 2011 WL 1638992, at *8 (D. Colo. May 2, 2011) ("A failure to preserve evidence may be negligent, grossly negligent, or willful[.]" (citing *Philips Electronics N. America Corp. v. BC Technical*, 773 F. Supp. 2d 1149, No. 2:08-cv-639 CW-SA, 2011 WL 677462, at *48 (D. Utah Feb. 16, 2011))); *Asher Assocs., LLC v. Baker Hughes Oilfield Operations, Inc.*, No. 07-cv-01379-WYD-CBS, 2009 WL 1328483, at *8 (D. Colo. May 12, 2009) ("Common sense suggests that a failure to produce or preserve relevant evidence may involve conduct that falls 'along a continuum of fault — ranging from innocence through the degrees of negligence to intentionality.'" (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002))); *U.S. ex rel. Baker v. Cmty. Health Sys.*, Inc., No. 05-cv-279 WJ/ACT, 2012 WL 12294413, at *3 (D.N.M. Aug. 31, 2012), *objections overruled*, 2012 WL 5387069 (D.N.M. Oct. 3, 2012)

("Spoliation includes the intentional or negligent destruction or loss of tangible and relevant evidence which impairs a party's ability to prove or defend a claim." (quoting *United States ex rel. Koch v. Koch Ind., Inc.*, 197 F.R.D. 488, 490 (N.D. Okla.1999))); *Minter v. Prime Equip. Co.*, No. 02-cv-132-KEW, 2007 WL 2703093, at *3 (Sept. 14, 2007) (E.D. Okla. 2007) (recognizing that "spoliation occurs with varying degrees of culpability"). However, the Court need not decide whether Plaintiff presented sufficient evidence of intentional spoliation to invoke the crime-fraud exception, as the evidence of fraudulent concealment discussed above is a sufficient basis to do so.

**B.  The "Sua Sponte" Nature of the Discovery Master's Report**

Defendant further argues that the Discovery Master took it upon himself to find a basis for application of the crime-fraud exception on grounds not asserted by Plaintiff. According to Defendant:

> [T]he Report chose to invade the attorney-client privilege on two grounds not raised by [Plaintiff]: first, that [Defendant] engaged in "concealment" by omitting material facts which it purportedly had a duty to disclose; and second, that [Defendant] engaged in "spoliation" by taking inadequate steps to preserve evidence after receiving a letter from [Plaintiff's counsel] in March 2012 asserting that [Defendant's] employee, Laura Bale, may have accessed [Plaintiff's] confidential information. By raising grounds to pierce the privilege that [Plaintiff] did not rely on in its motion, the Special Master erred.

*Objection* [#139] at 2.

Among other arguments, Plaintiff responds that it actually did raise the issues discussed in the Discovery Master's Order, and the Court agrees. *Response to Objection* [#148] at 12-15. Plaintiff's original Motion to Pierce Attorney-Client Privilege argued that Defendant engaged in fraud by making false and misleading statements about the extent of the company's investigation and knowledge, and that such statements are sufficient to

pierce the attorney-client privilege. *Motion to Pierce Attorney-Client Privilege* [#88] at 7,10, 16-18. Allegations of Defendant's inadequate document preservation and retention permeate Plaintiff's filings, despite Plaintiff's single use of the word "spoliation." *Id.* at 11, 17, 18. As Plaintiff points out, Defendant itself concluded, in responding to Plaintiff's Motion [#88], that Plaintiff was "insinuat[ing] that [Defendant] engaged in spoliation of materials relevant to this action." *Opposition to Motion* [#91] at 16. Defendant's contention that the Discovery Master "developed two bases not presented in Gates' motion to justify in camera review of [Defendant's] privileged documents" is, at best, a blind mischaracterization of both the lengthy pleadings and exhibits tendered by Plaintiff in support of the motion and the Special Master's careful work. *Objection* [#139] at 13. At worst, this contention is simply disingenuous.

Accordingly, the Court rejects Defendant's argument about the so-called "sua sponte" nature of the Special Master's Report.

### III. Conclusion

For the reasons explained above, Defendant's **Objection to Report and Recommendation of Special Master on Gates Corporation's Motion to Pierce Attorney/Client Privilege** [#139] is **OVERRULED**.

IT IS FURTHER **ORDERED** that Defendant shall submit a single USB thumb drive containing a readable and searchable version of the items numbered PRIV 00012 to PRIV 00164 to the Special Master **on or before May 24, 2019 at 5:00 p.m.**

IT IS FURTHER **ORDERED** that Defendant shall also submit an excel spreadsheet of the underlying privilege log in native format and capable of being edited to the Special

Master **on or before May 24, 2019 at 5:00 p.m.**

IT IS FURTHER **ORDERED** that the parties may file a brief of up to 10 pages with 10 attachments (aggregating no more than 100 pages per party) as further explained in the Discovery Master's Report **on or before May 24, 2019 at 5:00 p.m.**

Dated: May 21, 2019

BY THE COURT:

*[signature]*

Kristen L. Mix
United States Magistrate Judge